UNITED STATES of America ex rel. Syed RAHMAN, Plaintiff,

v.

ONCOLOGY ASSOCIATES, P.C., et al., Defendants.

In re Equimed, Inc., Debtor.

Merrill Cohen, Trustee, Plaintiff,

v.

Douglas Colkitt, M.D., et al., Defendants.

In re Nixon Equipment Corporation, et al., Debtors.

In re Equimed, Inc., Debtor.

Equimed, Inc., et al., Plaintiffs,

v.

Steadfast Insurance Company and Reliance Insurance Company, Defendants.

Civ. Nos. H–95–2241, H–00–1216, H–01–2676, H–01–3014.
Bankruptcy Nos. 00–1–1147–PM, 00–20825–PM to 00–20827–PM.
Adversary Nos. 00–1180, 00–1430.

United States District Court, D. Maryland.

Nov. 1, 2001.

S. Hollis Fleischer, Daniel A. Spiro, Office of U.S. Attorney, Baltimore, MD, Michael F. Hertz, Polly A. Dammann, Pamela K. Riley, Rebecca Rohr, U.S. Dept. of Justice, Civil Division, Washington, DC, for United States.

Mark Scott London, Christopher B. Mead, London & Mead, Washington, DC, for Syed Rahman.

Paul M. Sandler, Freishtat, Freishtat & Sandler, Baltimore, MD, John T. Brennan, Jr., Michaels, Wishner & Bonner, P.H., Washington, DC, for Oncology Associates, P.C. and Equimed, Inc.

Gertrude C. Bartel, Andrew J. Graham, Kramon & Graham, Baltimore, MD, for Atlantic Radiation Oncology, L.L.C.

Matthew Ralph Goldman, Cleveland, OH, Shelby F. Mitchell, Ronald F. Wick, Baker and Hostetler, Washington, DC, for Merrill Cohen.

John R. Sullivan, Long, Badger, Sullivan & Robertson, P.A., Salisbury, MD, Myles R. Wren, Law Office, Scranton, PA, for Sovereign Bank.

David M. Gische, Ross, Dixon & Bell, LLP, Washington, DC, for Steadfast Insurance Co.

Daniel James Standish, Wiley, Rein & Fielding, Washington, DC, for Reliance Insurance Co.

Edwin J. Mills, Stull, Stull & Brody, PH, New York City, for Herbard, Ltd.

Christopher L. Hamlin, Greenan, Walker, et al., Greenbelt, MD, Kimberly Luff Wakim, Thorp, Reed & Armstrong, LLP, Pittsburg, PA, for Johnson & Johnson Finance Corp.

Andrew C. Kassner, David B. Aaronson, Drinker, Biddle & Reath, Philadelphia, PA, for DVI Financial Services, Inc.

Matthew S. Sturtz, Joel Larkin Perrell, Jr., Miles & Stokbridge, PC, for Mobile Diagnostic, Inc., A. Jerome Digiacobbe, Jr., and Calvin Zontine.

Joyce A. Kuhns, Karl Joseph Nelson, Saul Ewing, LLP, Baltimore, MD, for Treatment Centers Ltd. Partnership, PFG Capital Corp., and Regional Medical Services, Inc.

Peter Konolige, Hoyle, Morris & Kerr, Philadelphia, PA, for Nationwide Mutual Insurance.

Jeffrey L. Tarkenton, Erik David Bolog, John David Folds, Womble, Carlyle, Sandridge & Rice, Washington, DC, for Oncology Services Corp.

Shawn J. Sefret, Rosenberg, Proutt, Funk & Greenberg, LLP, Baltimore, MD, for Malone Oncology Associates, P.C. and George Washington Real Estate Corp.

Paul Mark Nussbaum, Kenneth Oestreicher, Whiteford, Taylor & Preston, Baltimore, MD, Shawn J. Sefret, Rosenberg, Proutt, Funk & Greenberg, LLP, Baltimore, MD, for Nixon Equipment Corp.

## MEMORANDUM OPINION

ALEXANDER HARVEY, II, Senior District Judge.

These four cases are closely related. Civil No. H–95–2241 (the *"Rahman* case") is a False Claims Act ("FCA") suit brought initially in this Court by relator Syed Rahman as a *qui tam* action. On August 25, 1998, the United States filed its complaint in that case naming as defendants Dr. Douglas Colkitt ("Colkitt"), his wife, his business partner Dr. Jerome Derdel ("Derdel"), and more than 80 healthcare entities owned, operated or controlled by Colkitt. Defendants Colkitt and Derdel are physicians specializing in radiation oncology. The entities sued by the United States provided diverse healthcare services in the area of radiation oncology. As sub-

sequently amended, the complaint in Civil No. H–95–2241 alleged that the individual defendants and the oncology service providers engaged in fraudulent billing schemes, causing losses to Medicare and Champus programs in excess of $12 million. Claims under the FCA based on the presentation of false claims were asserted by the government, as well as claims of unjust enrichment and fraudulent transfers. According to the government, the penalties and treble damages sought by it amounted to approximately $86 million.

Following extended pretrial proceedings,[1] including numerous rulings by the Court on many different matters, the parties advised the Court that they wished to devote their energies toward the goal of reaching an expeditious settlement of the case. Accordingly, formal discovery was stayed, and the parties entered into mediation before Judge Curtis E. von Kann, a former judge of the District of Columbia Superior Court. After having been advised that substantial progress had been made in the mediation sessions, the Court extended the stay of discovery.

EquiMed, Inc. ("EquiMed") is one of the defendants in the *Rahman* case, as are many of its subsidiaries. On February 4, 2000, certain creditors[2] filed an involuntary petition in bankruptcy with respect to EquiMed in the United States Bankruptcy Court for the District of Maryland. *In re EquiMed, Inc.,* Bankruptcy No. 00–1–1147–PM. Thereafter, EquiMed was adjudicated by the Bankruptcy Court to be a debtor under Chapter 7 of the United States Bankruptcy Code. On March 3, 2000, Merrill Cohen was appointed Trustee

for the bankruptcy estate of the debtor EquiMed. On April 27, 2000, the Trustee filed in the Bankruptcy Court an adversary proceeding naming as defendants more than 80 persons and entities. Most of the defendants named in the adversary proceeding are also defendants in the *Rahman* case.

On May 2, 2000, this Court entered an Order withdrawing reference of the *EquiMed* bankruptcy case with respect to all matters in which a proposed settlement in the *Rahman* action might designate for Bankruptcy Court review and with respect to the Trustee's adversary proceeding. As withdrawn, that case was docketed in this Court as *In re EquiMed, Inc.,* Civil No. H–00–1216 (the "*EquiMed* case").

Meanwhile, settlement negotiations in the *Rahman* case continued. On July 24, 2000, the United States filed in the *EquiMed* case a motion for approval of three separate settlement agreements. Following a hearing on September 8, 2000, the Court entered an Order both in Civil No. H–95–2241 and in Civil No. H–00–1216 approving the settlement agreements. Because of the interrelationship of the *Rahman* case and the *EquiMed* bankruptcy case, the settlements reached were detailed and complex. The first settlement agreement resolved the *Rahman* case with respect to defendants Colkitt, Derdel and numerous corporations controlled in some manner by Colkitt. That agreement provided the United States with a monetary judgment in the amount of $9,885,000 against defendants Colkitt and numerous corporate defendants. The second settle-

---

1. Interlocutory appeals unsuccessfully challenging rulings of this Court resulted in two separate opinions of the Fourth Circuit. *See U.S. ex rel. Rahman v. Oncology Associates, P.C.,* 198 F.3d 489 (4th Cir.1999) and *U.S. ex rel. Rahman v. Oncology Associates, P.C.,* 198 F.3d 502 (4th Cir.1999).

2. The petitioning creditors are Mobile Diagnostech, Inc., A. Jerome DiGiacobbe, Jr. and Calvin Zontine.

ment agreement resolved the *Rahman* case with respect to defendants Keystone Oncology, LLC ("Keystone"), Oaktree Cancer Center Care ("Oaktree"), Rosewood Cancer Care, Inc. ("Rosewood") and Jefferson Radiation Oncology Limited Partnership ("Jefferson"). The third settlement agreement involved defendant Colkitt and his wife Joanne Russell and provided the government with a security interest in certain property jointly held by them. Payments to be made to the United States under this settlement were to be placed in escrow and held pending later approval of distributions by the Bankruptcy Court.

During the pendency of the *EquiMed* case, the Court has been required to rule on numerous matters involving the Trustee and the defendants named in the withdrawn adversary proceeding. After a Scheduling Order was entered in Civil No. H–00–1216, the parties in that case advised that they also were engaged in settlement discussions. Discovery was accordingly stayed. Eventually, a settlement was reached, and a Settlement Agreement (the "Global Settlement Agreement") has now been executed by the Trustee and by many other parties. The principal parties to the Global Settlement Agreement are the following: Bankruptcy Trustee Cohen; Colkitt; George Washington Real Estate Corporation; Nixon Equipment Corporation; Thomas Jefferson Real Estate Corporation; D & T Leasing; Marcy L. Colkitt & Associates, P.C.; National Medical Financial Services Corporation; Provident Bank; the United States; Syed Rahman; and Keystone, Oaktree and Rosewood. The first paragraph of the Global Settlement Agreement provides that each of the

adversary proceeding defendants are also parties to the Global Settlement Agreement. These defendants, including Joanne Russell,[3] are some 57 in number and are listed on Exhibit A to the Global Settlement Agreement.

On August 30, 2001, the Trustee filed in both the *Rahman* case and the *EquiMed* case a motion for approval of the settlement pursuant to § 363 of the Bankruptcy Code and Bankruptcy Rule 9019. Numerous parties have filed memoranda both in support of and in opposition to the Trustee's pending motion for approval. Memoranda in support have been submitted by the following: (1) the United States; (2) defendant Colkitt and other defendants named in the adversary proceeding; (3) defendants Keystone, Oaktree and Rosewood; and (4) Provident Bank. Memoranda in opposition to the pending motion for approval have been filed by the following: (1) the petitioning creditors; (2) DVI Financial Services, Inc. ("DVI"); (3) Indiana Hospital, Indiana Healthcare and Indiana Healthcare Properties (the "Indiana Hospital Entities"), (4) Steadfast Insurance Company ("Steadfast"); (5) Reliance Insurance Company ("Reliance") and (6) Treatment Centers Limited Partnership ("Treatment Centers") and PFG Capital Corporation("PFG").[4] PFG and Treatment Centers are on occasion jointly referred to herein as (the "Landlord").

Nixon Equipment Corporation, George Washington Real Estate Corporation and Thomas Jefferson Real Estate Corporation (collectively the "President Subsidiaries") are subsidiaries of EquiMed. On October 10, 2000, voluntary Chapter 11 petitions for relief were filed in the Bankruptcy Court with respect to all three of the

---

**3.** Joanne Russell is the wife of defendant Colkitt.

**4.** Herbard Ltd. and Johnson & Johnson Finance Corporation also filed oppositions to the pending motion for approval. These oppositions have now been withdrawn.

President Subsidiaries. Since that date, the President Subsidiaries have continued in possession and control of their assets as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Their bankruptcy cases are being administered together with the *EquiMed* case in the Bankruptcy Court. The President Subsidiaries are parties to the Global Settlement Agreement, and the Bankruptcy Court's approval of the settlement under Rule 9019 is also necessary in their cases. Recently, the Trustee and the President Subsidiaries filed a motion for withdrawal of reference with respect to the President Subsidiaries' participation in the settlement and with respect to certain motions to assume and assign leases filed in the Bankruptcy Court. Since the matters in question are closely related to the settlement reached by the Trustee in the *EquiMed* case, the Court entered an Order on September 19, 2001 granting that motion for withdrawal of reference. The matters withdrawn have been docketed in this Court as *In re Nixon Equipment Corporation, et al.,* Civil No. H–01–2676.

There has been pending in the *EquiMed* bankruptcy case an action brought by EquiMed, Colkitt and others against Steadfast and Reliance (hereinafter the "Coverage Action"). That action was originally brought in a state court in Pennsylvania, was removed to a Pennsylvania federal court and was then transferred to the Maryland Bankruptcy Court where it is now a part of the *EquiMed* bankruptcy proceedings. The Coverage Action was docketed in the *EquiMed* bankruptcy case as Adversary No. 00–1430–PM. In its Memorandum and Order of October 20, 2000 entered in Civil No. H–00–1718, this Court denied the motion of Joanne Russell to withdraw reference of the Coverage Action and to remand it to the Pennsylvania state court. Thereafter, the Trustee entered into a settlement of the Coverage Action with Steadfast and Reliance, and the Trustee filed in Adversary No. 00–1430 a motion for approval of that settlement. Oppositions to that motion were filed by Colkitt and the United States. The reference of that motion has now been withdrawn by this Court, and that matter has been docketed in this Court as Civil No. H–01–3014.

Two lengthy hearings on the Trustee's pending motion for approval of the settlement and on related matters have been held in open court. At the first hearing, the Trustee and several other witnesses testified. At the second hearing held after further memoranda were submitted by the parties, the Court heard lengthy argument of counsel for the many parties. After careful consideration of the record, the parties' voluminous memoranda and the arguments presented, this Court concludes that the Trustee's pending motion for approval of the settlement set forth in the Global Settlement Agreement must be granted, that the Trustee's pending motion for approval of the settlement of the Coverage Action must be denied and that the motions to assume and assign ground leases must be granted.

I

*The Global Settlement Agreement*

The Global Settlement Agreement which the Court has been asked to approve is lengthy and detailed. The Trustee's pending motion for approval of that settlement presents questions as to two other settlements, the settlement of the Coverage Action (the "Coverage Settlement") and the settlement of the *Rahman* case (the "Rahman Settlement"). The settlement which the Trustee asks to have approved in his pending motion will be referred to herein as "the Global Settlement."

Steadfast and Reliance (collectively "the insurers") previously issued liability policies (the "insurance policies") to EquiMed, its officers and directors. The adversary action brought by the Trustee and others against the insurers in the Bankruptcy Court seeks to determine the extent of coverage under those insurance policies. On January 8, 2001, the Trustee filed in the Bankruptcy Court a motion for approval of a settlement reached with the insurers (the "Insurance Settlement"), and it is that motion which is currently pending before this Court as a result of the Court's recent withdrawal of the reference of that matter, docketed herein as Civil No. H–01–3014. In the motion which he has now filed in this Court seeking approval of the Global Settlement, the Trustee has asked this Court to enter an Order permitting him to withdraw from the Insurance Settlement because the two settlements are inconsistent.

At or about the time that the Global Settlement Agreement was executed, the United States and numerous other parties involved in the *Rahman* case and the *EquiMed* case, entered into an agreement styled "Modification of Settlement Agreements" (the "Modification"). In that document, the parties recognized that litigation involving EquiMed and the President Subsidiaries in the Bankruptcy Court was interfering with the ability of the parties to timely complete the terms of the three *Rahman* settlements. The Modification sought to resolve disputes concerning the ownership of property which the Trustee claimed as assets of the bankruptcy estate and concerning amounts to be paid to the United States under the *Rahman* settlements.

The core provisions of the Global Settlement Agreement itself may be summarized as follows:

1. *Cash Receipts.* The Trustee will receive the sum of $1,300,000 and payment into the estate of escrows which have been held since prior to the commencement of the bankruptcy case. In exchange for the $1,300,000, the Trustee will transfer real estate at Laurinberg, North Carolina, turn over claims regarding the insurance policies and the Coverage Action, D & O insurance proceeds and certain other litigation, and withdraw from the Insurance Settlement, all upon entry of an order of this Court approving this proposed agreement and instructing the Trustee to so act.

2. *Sale of Cancer Centers.* The nine cancer treatment centers still operating will now be sold. An independent business broker will be selected to carry out the sales. After costs of sales are deducted, the net proceeds of the sale will be divided with 60% of the proceeds going to the EquiMed estate, and the balance going to the Defendants. It is anticipated that the Defendants' separate obligations to the United States, arising out of the *Rahman* Action settlement, will be paid to the United States from the amounts received by the Defendants under these sales. The Defendants' interests and the right of the Defendants to receive proceeds of sale, are all pledged to the United States under the *Rahman* Action settlement. In connection with these sales, the Trustee has the option to include at a fixed price, or exclude, certain equipment claimed by Defendants to belong to Oncology Services Corporation or D & T Leasing. Certain obligations secured by liens on the equipment must be paid, if the Trustee elects to take the equip-

ment. Colkitt is also guaranteeing that the Trustee will receive at least $2,000,000 on account of the sales described in this paragraph.

3. *The KOR Cancer Centers.* The Keystone, Oaktree and Rosewood Cancer Centers (the "KOR Centers"), and their ownership entities, will execute new Notes in favor of Provident in an amount equal to the current outstanding principal due under the old KOR Notes without deduction for amounts paid or to be paid by the KOR Centers to the United States (the "New KOR Notes"). The New KOR Notes now bear commercially standard terms, and will be accepted by Provident in exchange for cancellation of the notes originally issued by Keystone Oncology, LLC, Oaktree Cancer Care, Inc., and Rosewood Cancer Care, Inc., which had been pledged to Provident Bank as collateral prior to the commencement of the bankruptcy case of EquiMed.

4. *All Other Property.* All other property of the EquiMed estate, and of the closed cancer treatment centers, will be sold with the proceeds being paid to the bankruptcy estate, except for certain real estate located in Vineland, New Jersey. With respect to the Vineland, New Jersey property, the proceeds will be split between Colkitt and the Trustee based upon an agreed upon distribution set forth in the Settlement Agreement.

5. *U.S. Government.* The United States Government will reduce its claim in the EquiMed estate to the amount of its settlement in the *Rahman* Action, $9,885,000, and the claim will be reduced to the extent of each dollar received by the United States from any source associat-

ed in any respect with these lawsuits. The estate will surrender any claims it has against assets pledged to the United States under the *Rahman* Action settlement approved by the District Court in September of 2000 or any payments that have been made or will be made by the Defendants in order to satisfy their obligations to the United States pursuant to the September 2000 settlement, except to the extent the United States has agreed to share those assets with the bankruptcy estate in the manner described above. The United States Government will also release its claims in the *Rahman* Action against EquiMed's subsidiaries.

6. *Provident Terms.* Provident Bank, as secured lender, shall be entitled to receive as paid 76% of the Trustee's share of payments from the sale of the nine operating Colkitt Centers, all of the proceeds of the KOR notes, and a lien on one million dollars of the $1.3 million Cash Receipts discussed in Paragraph 1 above to the extent that Provident's cash collateral is used by the Trustee. In exchange, Provident Bank will permit certain other cash collateral to be used, and other secured property surcharged, for past and future professional fees, and receive a superpriority lien and payment as received of $1 million of the cash receipts as adequate protection. It also waives certain individual rights against Colkitt.

Pertinent provisions of the Insurance Settlement may be summarized as follows:

1. The insurance policies will be rescinded.

2. The insurance companies will return to the Trustee $852,535 as policy premiums, plus interest.

3. Steadfast will in addition pay the Trustee $350,000 and Reliance will pay the Trustee $100,000.

4. Steadfast will waive its right to recoup over $500,000 of defense costs previously advanced by it.

5. The Court will enter an Order declaring the Steadfast and Reliance insurance policies to be void *ab initio* and of no legal force.

6. The Order to be entered by the Court will bar any claims to proceeds of the rescinded policies, will dismiss with prejudice the Coverage Litigation, and will bar subsequent claims which might be brought against the carriers under the policies or for the manner in which the dispute was resolved.

## II

### *Applicable Principles of Law*

The Trustee's motion for approval of the Global Settlement has been filed pursuant to Bankruptcy Rule 9019 and § 363 of the Bankruptcy Code. Rule 9019(a) provides that on motion by the trustee and after a hearing on notice to creditors and others, "the court may approve a compromise or settlement." § 363(b)(1) provides as follows:

The Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

In *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) ("*TMT*"), the Supreme Court discussed the standards to be applied by a bankruptcy court in considering whether to approve a settlement in a bankruptcy case. The Supreme Court stated that the bankruptcy court should

apprise [itself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties in collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.

██ Under *TMT,* the following factors must therefore be considered by a court which has been asked to approve a settlement:

(a) the probability of success in litigation;

(b) the difficulties, if any, to be encountered in the matter of collection;

(c) the complexity of the litigation involved (including the expense, inconvenience and delay necessarily attending the litigation); and

(d) the paramount interest of the creditors and a proper deference to their reasonable views.

*See Jackson Brewing Co. v. Herpel (In re Jackson Brewing Co.),* 624 F.2d 605, 607 (5th Cir.1980); *Drexel Burnham Lambert, Inc. v. Flight Transp. Corp. (In re Flight Transp. Corp. Sec. Litig.),* 730 F.2d 1128, 1135 (8th Cir.1984).

██ Settlements are to be encouraged, and it should not be the intention of a court to discourage settlements. *In re Smith,* 210 B.R. 689, 692 (Bankr.D.Md. 1997); *In re New York, New Haven and Hartford Railroad Co.,* 632 F.2d 955, 959–60 (2d Cir.1980). A court may approve a settlement over objections unless the proposed settlement falls below the "lowest point in the range of reasonableness." *In*

*re W.T. Grant Co.,* 699 F.2d 599, 608, 613 (2d Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *In re Bowman,* 181 B.R. 836, 846 (Bankr.D.Md. 1995). A settlement should be approved if it provides for "the best possible realization upon the available assets...without undue waste or needless or fruitless litigation." *In re Bowman,* 181 B.R. at 847 (citing *In re Central Ice Cream,* 59 B.R. 476, 487 (Bankr.N.D.Ill.1985)).

■ In applying the principles of the cases cited hereinabove, the essential inquiry which this Court must make in this particular case is to determine whether the compromise reached by the parties is "fair and equitable" and in the best interests of the estate. *Drexel Burnham,* 730 F.2d at 1135.

### III

#### The Petitioning Creditors

■ The petitioning creditors claim that as a result of a judgment obtained by them in July of 1999 in the Court of Chancery of Delaware, EquiMed was indebted to them at the time that it was placed into bankruptcy in the amount of $25,497,227. The Trustee has stated that he does not believe that there is a likelihood of any significant recovery for unsecured creditors in the pending *EquiMed* bankruptcy case or in the bankruptcy cases of the President Subsidiaries. The petitioning creditors disagree and vigorously oppose the Global Settlement which the Court has been asked to approve.[5] The petitioning creditors contend that the Trustee should not settle the adversary action brought by him against Colkitt and more than eighty other persons and entities but should vigorously pursue it.[6] In support of this argument, the petitioning creditors rely heavily on the financial status of Colkitt and EquiMed in the years before the bankruptcy. According to them, EquiMed, which was formed in early 1996, owned and operated more than thirty financially successful cancer treatment centers. They claim that Colkitt has devised a blatantly fraudulent scheme to transfer substantially all of EquiMed's assets to himself and his friends and relatives.

In particular, the petitioning creditors note that EquiMed engaged in a marketing campaign in 1997 and 1998 to sell the centers to the highest bidder. According to them, there were two offers, both in excess of $100 million. However, as a result of due diligence investigations and other circumstances, neither deal went forward. It is further asserted by the petitioning creditors that Colkitt agreed to fully indemnify any loss sustained by EquiMed in the case brought by them against it in Delaware. They claim that Colkitt has vast resources which should be pursued by the Trustee. According to the petitioning creditors, Colkitt's friends and relatives acquired for $7.4 million in nonrecourse notes centers which were valued by the Delaware court at $38.2 million. As noted hereinabove, there are nine cancer treatment centers which are mentioned in the Global Settlement Agreement and which are to be sold. The petitioning creditors claim that these centers are owned by EquiMed, and they object to the provision in the Global Settlement Agreement awarding only 60% of the proceeds of

---

5. The petitioning creditors have previously filed a motion to remove Merrill Cohen as the Chapter 7 Trustee in the *EquiMed* case. That motion was denied for the reasons stated in the Court's Memorandum Opinion of September 25, 2001.

6. The parties agree that EquiMed's principal asset is the amount which the Trustee might be able to recover in the adversary action brought by him in the bankruptcy case.

their sale to the Trustee. They argue that there is no merit to Colkitt's contention that he took control of these centers when he canceled management contracts between the centers and EquiMed. According to the petitioning creditors, EquiMed paid millions of dollars for the cancer centers which Colkitt now claims to own.

In advancing these arguments, the petitioning creditors overlook the substantial problems faced by the Trustee were he to litigate the adversary action to a successful conclusion. The Trustee candidly states that he believes that he would ultimately prevail if the adversary action proceeded through a lengthy period of discovery and a long trial. However, it is the Trustee's opinion that the eventual recovery would not be much more than that obtained by him for the estate under the Global Settlement Agreement. As noted by the Trustee, there would be enormous attorneys' fees and other costs which the estate would have to pay were the case to go forward. Moreover, the value of the operating centers would be deteriorating with the passage of time.

In opposing the Trustee's motion for approval of the settlement, the petitioning creditors overlook significant events. The government's complaint in the *Rahman* case was filed in 1998. In that year, the United States, through its many Medicare carriers, suspended Medicare reimbursement payments to a large number of professional corporations ("PCs") which were managed by EquiMed. This action had a devastating effect on the financial affairs of the various related entities and on arrangements made between them and EquiMed.

In 1999, Colkitt terminated the management agreements between the PCs and EquiMed. At the time of the termination, EquiMed was a crippled company. The $100 million offers to buy EquiMed did not result in finalized deals, in part because of the existence of the *Rahman* lawsuit and the government's suspension of Medicare payments.

It is apparent from the record that the Trustee would face substantial problems in obtaining a recovery from Keystone, Oaktree and Rosewood. These entities purchased assets of the cancer centers in Pennsylvania for cash and promissory notes given to Provident Bank. The petitioning creditors challenge the validity of those purchases. However, it is doubtful that the Trustee would be able to prove that the notes are worthless because the terms were favorable to the makers and because they lacked adequate consideration. The KOR entities have already paid more than $1.2 million on the notes. If the notes are invalid and if these transactions were voided, EquiMed would have to assume liability for this amount.

If the Trustee were to prevail in the adversary action, the estate would take over the closed cancer treatment facilities and the ownership of the nine centers which are presently operating. However, the PCs owned by Colkitt have agreed to pay the government $9.885 million. The EquiMed estate could not realize any assets from the sale of these centers without first satisfying the claim of the United States which, under its settlement, has a perfected security interest in the value of these centers.

It is apparent on the record here that litigation of the adversary proceeding would be lengthy, contentious and expensive. Numerous complex issues would have to be resolved if the case went forward. Many arguments in opposition to the Trustee's position have been advanced by the defendants, and substantial defenses are available to the defendants named in the amended complaint. It is not for this Court to attempt to resolve at this

stage of the proceedings any of the difficult questions presented in the Trustee's adversary proceeding when the pertinent facts have not been developed by discovery and at trial. Rather, the inquiry here requires the Court to determine whether it was reasonable for the Trustee to decide that under the available facts more could be obtained for the estate by way of the Global Settlement than by way of lengthy and costly litigation.

Applying the principles of the Supreme Court's *TMT* decision, this Court concludes on the record here that, insofar as the objections of the petitioning creditors are concerned, the Global Settlement negotiated by the Trustee is fair and equitable and is in the best interests of the debtor's estate. There is only a slight probability that the Trustee would obtain a judgment in the adversary proceeding in excess of the amount which is being paid to the estate under the Global Settlement Agreement. To obtain a favorable result in the litigation, the Trustee would be required to overcome many difficulties. As noted hereinabove, cogent defenses to the claims alleged in the amended complaint have been asserted by the defendants in the adversary proceeding. The litigation is exceedingly complex. More than eighty parties have been named as defendants, and separate defenses of many of them would have to be considered by the Court. The discovery period can be expected to be a lengthy one, to be followed no doubt by time-consuming dispositive motions. The trial itself would presumably last for many weeks if not months.

Quite obviously, litigation of the adversary action to a conclusion would be very expensive.[7] At the present time, the bankruptcy estate has few liquid assets, and funds are not available for the payment of experts, attorneys' fees or other litigation costs. Pursuant to orders entered by the Bankruptcy Court, only $75,000 has previously been made available to the Trustee for the funding of the prosecution of the adversary proceeding. This amount was provided by Provident from sources against which Provident had asserted a lien. In the absence of concessions by other parties, DVI has declined to advance to the estate funds necessary for the prosecution of the Trustee's adverse action, and both DVI and the petitioning creditors have refused to assume the responsibility and cost of litigating that action to a conclusion.

During the lengthy period necessary for the continued prosecution of the adversary action, the value of the cancer centers would undoubtedly deteriorate, in part because of the pendency of the litigation. The petitioning creditors argue that Colkitt has agreed to indemnify EquiMed for the judgment obtained by them in the Delaware Court of Chancery. They maintain that the Trustee should pursue an indemnification claim against Colkitt. However, the indemnification agreement has been canceled. Even if the Trustee were able to set aside the cancellation, Colkitt's obligation under the indemnification agreement would not become final until EquiMed had actually paid the amount due under the judgment.[8]

Moreover, it would be difficult for the Trustee to collect from Colkitt if the Trustee were able to obtain a substantial judgment against him. Colkitt is a resident of Florida, and property held by him and his wife as tenants by the entireties is

---

7. The Trustee has estimated that administrative costs of the combined debtors' estates have already amounted to some $2,400,000 through August 31, 2001.

8. The judgment itself is presently on appeal to the Supreme Court of Delaware.

not available for the satisfaction of a judgment entered against him in favor of the Trustee. Furthermore, there are other substantial judgments against Colkitt which are presently outstanding.[9]

There is no merit to the petitioning creditors' contention that the Trustee has not conducted an adequate investigation into the financial affairs of EquiMed and the other debtors. This argument was rejected by this Court in its Memorandum Opinion of September 25, 2001. The Court there noted, *inter alia*, that some 300 to 400 boxes of documents had been indexed and reviewed by the Trustee, and that the deposition of Colkitt had been taken over a period of seven days. In denying the petitioning creditors' motion to remove Merrill Cohen as the Trustee, this Court concluded in its ruling that the Trustee, "faced with the complexities resulting from the confusing interrelationship of Colkitt's many entities and his continuing obstructionist tactics," had acted reasonably in his investigation of the affairs of EquiMed. (op. at 146).

Finally, the paramount interest of several large creditors and a proper deference to their reasonable views supports approval of this settlement. If the Global Settlement is not approved, the government expects to file a claim in the bankruptcy case in the amount of some $65 million. Provident Bank is owed some $20 million. Both of these creditors support the Global Settlement. Although DVI, which has a claim of some $5.5 million, opposes the settlement, it appears that the perfected liens held by it on equipment and other tangible property will result in the satisfaction of a part of its claim. The petitioning creditors, with an unsecured claim in excess of $25 million, are not willing to fund the costs of litigating the adversary proceeding but want the Trustee to take the risks involved in litigating that proceeding to a conclusion. Merrill Cohen is an experienced bankruptcy trustee who has testified that, after considering all applicable factors, he believes the settlement reached to be fair and equitable and in the best interests of the estate. Full credit will be given by the Court to this testimony. The big picture here convinces the Court that this settlement should be approved because it does not fall below the "lowest point of reasonableness." *In re W.T. Grant Co.*, 699 F.2d at 608.

For all these reasons, the objections of the petitioning creditors to the Global Settlement will be overruled.

## IV

### *DVI*

■ DVI is a creditor in the EquiMed and President Subsidiaries bankruptcy cases and has a claim against the debtors in excess of $5.5 million. DVI maintains that its claim is secured by liens against various assets of the debtors. It objects to both the procedures established by the Global Settlement Agreement and to substantive provisions of this Agreement.

In particular, DVI contends that it has a first priority lien on any recovery obtained by the Trustee in the adversary proceeding, which is acknowledged to be the most valuable asset of the estate. According to DVI, since it has a lien on any such recovery, it also has a lien on the proceeds to be received by the Trustee under the Global Settlement. DVI objects to provisions of the Global Settlement which grant superpriority liens to Provident.

---

**9.** At the present time, judgments in the approximate amount of some $45 million are outstanding against Colkitt.

Prior to the institution of bankruptcy proceedings against EquiMed and its subsidiaries, DVI entered into leases with and extended loans to various debtors pursuant to lease and loan agreements and other documents. In its surreply memorandum, DVI states that it does not claim a lien in every asset of the debtors' estates. Rather, DVI asserts that it holds a valid and perfected security interest in (1) the 60% Trustee percentage to be received from the sale of the nine remaining cancer centers which are still operating; (2) the $2 million consideration being paid by the KOR defendants by delivery of replacement notes; (3) the Colkitt settlement payment to the extent that it is being paid in settlement of the claims asserted in the adversary proceeding or in acquisition of the Ernst & Young and Mohan claims;[10] and (4) assets to the extent that the Williams County proceeds and the *Rahman* settlement amount include proceeds of assets of Nixon as to which DVI has perfected its liens. In responding to these contentions, the Trustee and Provident Bank agree that DVI does have valid and perfected liens on equipment leased to the debtors but they deny that DVI holds liens on general intangibles owned by the debtors' estates, including any recovery obtained by the Trustee in the adversary proceeding and amounts to be paid to the Trustee under the Global Settlement Agreement. They also deny that DVI has enforceable security interests in EquiMed's accounts receivable or contract rights.

■ In determining whether a settlement should be approved, the Bankruptcy Court has the duty to review and determine the relative priorities of various creditors. *In the Matter of AWECO, Inc.,* 725 F.2d 293, 298 (5th Cir.1984); *In re American Reserve Corporation,* 841 F.2d 159, 162 (7th Cir.1987) ("the 'fair and equitable' analysis-comparing claims' relative priorities—is just one factor for the bankruptcy judge to consider in determining whether a settlement is in the estate's best interest."). Pursuant to § 363(*o*)(2), in any hearing held under § 363, "the entity asserting an interest in property has the burden of proof on the issue of the validity, priority or extent of such interest."

■ In applying those principles to facts of record here, this Court concludes that DVI has not met its burden of showing that it has a valid and perfected lien in any of the various items in dispute. First, the Court concludes that DVI does not hold valid and perfected security interests in any instruments of the debtors, including the KOR notes. Under U.C.C. §§ 9–105 and 3–104, notes are classified as instruments. Under § 9–305, a security interest in an instrument is perfected by possession. Thus, pursuant to § 9–304(1), a security interest in an instrument can be perfected by possession only and not by filing. *See Trinity Holdings, Inc. v. Firestone Bank,* 1994 WL 449258, *7, 1994 U.S. Dist. LEXIS 6538, *18 (W.D.Pa.1994). Since Provident holds the KOR notes, Provident is in possession of these instruments and therefore has a valid and perfected security interest in them. Accordingly, it is Provident and not DVI which would have the right to receive proceeds paid by the KOR defendants as a result of their delivery of the replacement notes.

It is also argued that under the notes previously issued by them, the KOR defendants have offset rights valued at $2 million, that these rights are being surren-

---

**10.** Prepetition, EquiMed has asserted a claim against Ernst & Young, LLP, in a case currently pending before a panel of the American Arbitration Association. Another EquiMed claim has previously been asserted against Dr. Madhu K. Mohan.

dered as a part of the settlement and that DVI has a lien on these offset rights. However, the offset rights were never owned by the EquiMed bankruptcy estate and were therefore never enforceable by the estate. The rights in question are being surrendered in exchange for a release from Provident. Since Provident and not the Trustee held the KOR notes, the KOR defendants were entitled to surrender their offset rights in exchange for a release from Provident. Under the circumstances, there is no merit to DVI's argument that it has an enforceable lien in the KOR offset rights.[11]

DVI has also argued that, to the extent that the Williams County proceeds and the *Rahman* settlement amounts include proceeds of assets of Nixon as to which DVI has perfected its liens, DVI has a claim to those assets as well. The Trustee disputes this contention and claims that DVI has no right to the Williams County escrow proceeds or to assets in the *Rahman* escrow fund. Under the Global Settlement, the bankruptcy estate is to receive approximately $500,000 of Nixon funds from the proceeds of the sale of cancer centers in Ohio.

On the record here, this Court concludes that DVI has not met its burden of proving that it has a priority lien in these assets. No documents have been produced by DVI showing that it has a perfected security interest in proceeds derived from the sale of cancer centers in Ohio. The necessary financing statements have not been filed by DVI. Accordingly, this Court will reject DVI's assertion that it has a lien on these proceeds.

The other two claims of DVI are based on its contention that it holds valid liens on

the proceeds which the estate would be receiving in settlement of the Trustee's adversary proceeding. According to DVI, it has a valid and perfected security interest in the property which was fraudulently transferred, and therefore it has a valid and perfected security interest in any amounts received by the Trustee by way of settlement. It has been held that a security interest in the proceeds of a fraudulent transfer action attaches regardless of whether the case is tried on the merits or settled. *See e.g., In re Figearo*, 79 B.R. 914 (Bankr.D.Nev.1987). DVI notes that the claims asserted by the Trustee in the adversary proceeding focused on three areas, namely: (1) the fraudulent transfer of real and personal property by Colkitt from EquiMed to the President Subsidiaries and the subsequent transfer of such property to entities wholly owned by Colkitt, his relatives or friends; (2) the wrongful termination of the EquiMed management contracts by professional corporations owned by Colkitt; and (3) the fraudulent conveyance of certain assets of the debtors to the KOR defendants.

On the record here, this Court concludes that Provident and Provident alone has a security interest in EquiMed's general intangibles, including amounts which might be recovered by the Trustee in the pending adversary proceeding. On or about December 17, 1997, Provident and EquiMed entered into a security agreement which, *inter alia,* specifically granted Provident an interest in all of EquiMed's "general intangibles." There is no similar security agreement in existence giving DVI a lien in all general intangibles of the debtors.

11. In any event, were the KOR offset rights determined to constitute proceeds obtained as a result of the Trustee's adversary proceeding as DVI has argued they must be, the rights in question would have to be characterized as general intangibles. As discussed at some length hereinafter, DVI has no lien on general intangibles of the debtors.

DVI argues that it has security interests in accounts receivable of EquiMed and in EquiMed's contract rights. But, even if such liens existed, it has been recognized in the bankruptcy proceedings that EquiMed has no accounts receivable. Moreover, there is convincing evidence that the management agreements were terminated prepetition. Any judgment which the Trustee might obtain in the adversary proceeding cannot be characterized as being the recovery of accounts receivable or contract rights. It is the bundle of various intangible rights which constitutes the core value of any recovery which the Trustee might obtain in his adversary action.

DVI focuses principally on the management contracts. According to DVI, these contracts constitute rights to payment and/or contract rights held by EquiMed and should be classified as "accounts" under U.C.C. § 9–106. DVI argues that it had a valid and perfected security interest in such "accounts" of EquiMed prior to their fraudulent conveyance and that its security interest remains and attaches to the proceeds of the proposed settlement of the claims asserted by the Trustee in the adversary proceeding.

On the record here, this Court concludes that, even if they existed at the time of the bankruptcy, the management contracts in question and any amounts to be paid thereunder are not accounts receivable or contract rights under the U.C.C. Rather, they must on the record here be deemed to be general intangibles under U.C.C. § 9–106. EquiMed's right to control the professional corporations was derived from a stock option agreement in which EquiMed had the right to purchase professional corporations owned by Colkitt for $1 each. It was the stock options and management agreements which provided EquiMed with its control over the profes-

sional corporations. In *In re Scheidmantel Olds–Cadillac, Inc.*, 144 B.R. 296 (Bankr.W.D.Pa.1992), the court concluded that a sales and service contract was a general intangible and not a contract right or account under the U.C.C. because it was more like a franchise or license agreement involving "a continued undertaking between the contracting parties to cooperate in the operation of the... business..." *Id.* at 298 (citations omitted). The management contracts at issue here involve a continued undertaking between the parties in the operation of the businesses, and therefore must be classified as general intangibles under the U.C.C. Moreover, stock options are general intangibles under the Uniform Commercial Code. *See In re Larson*, 1993 WL 367106 at *3 (Bankr. D.N.D.1993).

The record here discloses that, since the management contracts and the right to control the entities in question must be classified as general intangibles, Provident is the entity which has a valid and perfected security interest in these assets. Provident has offered proof establishing that it has a valid lien on general intangibles of the EquiMed estate. These general intangibles include not only the management contracts and the right to control the business of the centers but also the right to proceeds to be received by way of a lawsuit or a settlement of that suit. Under the U.C.C., a lawsuit is classified as a "general intangible." *In re Bell Fuel Corp.*, 99 B.R. 602, 605–06 (E.D.Pa. 1989). Since DVI does not have a security interest in general intangibles, it does not have a lien on the proceeds to be received by the Trustee in settlement of the Trustee's adversary proceeding.

Under U.C.C. § 9–203, a security interest is not valid against a debtor with respect to collateral unless the debtor has signed a security agreement which con-

tains a description of the collateral. *In re Trost Mfg. Co.,* 1999 WL 1186788, *1, 1999 Bankr.LEXIS 1540 *5 (Bankr.W.D.Pa. 1999). A financing statement alone, even when signed by the debtor, does not create a security interest. *In re Soden–Mardane Excavating, Inc.,* 178 B.R. 631, 634 (Bankr.M.D.Pa.1994). Here, there is no security agreement between DVI and any of the debtors which grants to DVI a security interest in all of the general intangibles of EquiMed and the other debtors. The Trustee's adversary action brought against Colkitt and his related entities sought to recover the value of the intangible rights which EquiMed possessed in controlling the entities which Colkitt created and which conducted EquiMed's business. DVI does not have a lien on the proceeds which the Trustee was seeking to recover by way of his adversary action.

DVI's claim that it has a lien on the general intangibles of EquiMed and the other debtors is based essentially on Equipment Schedule 001 to Master Equipment Lease 1613 dated September 4, 1997.[12] DVI is a company engaged in the business of equipment leasing,[13] and in its many dealings with EquiMed and its subsidiaries, DVI has mainly acted as a lessor of equipment. On numerous occasions, DVI leased equipment and other tangible personal property to the debtors. The interests of DVI were protected by the lease agreements themselves. DVI did not, as Provident did, loan money to the debtors and secure such loans by security agreements which created liens on the debtors' general intangibles.

Although lease agreements may be treated as security agreements under Article 9 of the U.C.C., the documents relied upon by DVI are essentially leases of equipment and do not create a security interest in all of the debtors' general intangibles. DVI contends that under Master Equipment Lease 1613, EquiMed granted to DVI a security interest in all assets described in equipment schedules executed from time to time pursuant to the Master Equipment Lease. DVI relies on the fact that "general intangibles" are, *inter alia,* listed as "equipment" under Equipment Schedule 001. As a result, DVI argues that it has a security interest in all general intangibles of EquiMed. The Court must disagree. The documents in question provide for the financing of equipment used to operate a cancer center located in Newburgh, New York. They do not grant to DVI a lien on all other property of the debtors, including all "general intangibles."

The document in question lists the location of the "equipment" thereby leased as being at 7 Hudson Valley Professional Plaza, Newburgh, New York 12250. The document itself is titled "Master *Equipment* Lease" (emphasis added) and relates by its terms only to tangible personal property. The Lease states that the Lessor leases to the Lessee all of the tangible personal property "described in each equipment schedule" with all present and future accessories, additions, upgrades, attachments, repairs and replacement parts. In addition, Master Equipment Lease 1613 states that title to the equipment remains with DVI. Although the Master Equipment Lease itself does not mention "general intangibles," Equipment Schedule 001 does include "general intangibles" in its description of the equipment being leased.

---

**12.** DVI became owner of the equipment thereby leased pursuant to a sale and leaseback agreement between the parties.

**13.** In the motion filed by it in the Bankruptcy Court in Case No. 00–20826–PM seeking, *inter alia,* relief from the automatic stay, DVI stated: "DVI is a company engaged in the business of equipment leasing."

Were the Court to credit arguments advanced by DVI, provisions of the Master Equipment Lease and Equipment Schedule 001, when read together, would be construed as providing that DVI as the owner was leasing to EquiMed general intangibles as well as tangible personal property. However, to be included as property being leased, general intangibles would have to be "tangible personal property," and DVI would have to be the owner of the general intangibles as well as of the tangible personal property. But only "tangible" personal property was being leased, and general intangibles obviously cannot, as provided in the lease, be "tangible personal property described in [an] equipment schedule." The interpretation of the documents urged by DVI makes no sense at all. This Court concludes that Equipment Schedule 001 was specifically intended to deal only with tangible personal property leased by the debtors and used at the Newburgh Center. The term "general intangibles" in Equipment Schedule 001 is meaningless surplusage. The Court concludes that the documents in question were not intended to give DVI a security interest in all of the general intangibles of EquiMed and the other debtors.

■■■ At the very least, there are ambiguities in the boilerplate documents relied upon by DVI. DVI's forms were used and DVI drafted the leases and the financing statements. "[I]t is hornbook law that in determining the intent of the parties, ambiguities are to be construed against the drafter." *Shovel Transfer and Storage, Inc. v. Pa. Liquor Control Board,* 559 Pa. 56, 739 A.2d 133, 139 (1999). "The terms of the [security] agreement must be strictly construed against ... [the] drafter of the agreement." *Lader's Tiffany Feed and Supply Co., Inc. v. Kohl (In re Kohl),* 18 B.R. 670, 672 at n. 1 (Bankr.W.D.Wis. 1982). Under § 363(*o*)(2) of the Bankrupt-

cy Code, DVI, as the entity asserting an interest in the property, has the burden of proof on the issue of the validity, priority, or extent of such interest. Construing the ambiguities in the documents in question against DVI, as the drafter, this Court concludes that DVI has not met its burden of proving that Master Lease 1613 and Equipment Schedule 001 granted DVI a security interest in all the general intangibles of the debtors' estates.

In sum, this Court concludes that DVI has not met its burden of showing that it has a priority lien in the debtors' general intangibles or in any of the debtors' other assets except for equipment leased to the debtors. Accordingly, DVI's objections to the Global Settlement will be overruled.

### V

#### *Steadfast and Reliance*

■■■ On January 8, 2001, the Trustee filed in the Bankruptcy Court a motion for approval of a settlement of the Coverage Action reached by him with Steadfast and Reliance. Reference of that motion has now been withdrawn and has been docketed in this Court as Civil No. H–01–3014. Steadfast and Reliance urge this Court to grant that motion. In addition, these insurers object to aspects of the Global Settlement which relate to the Insurance Settlement. The Global Settlement Agreement provides that the Trustee will take all steps necessary to withdraw from the Insurance Settlement, will assign to Colkitt or his designee EquiMed's interest in the insurance policies and will cooperate with Colkitt in the pursuit of his claims under the policies.

Provisions of the Global Settlement Agreement are clearly inconsistent with provisions of the Insurance Settlement. The Court now has before it in these pending cases the Trustee's motion to approve

the Insurance Settlement, and the Trustee's motion to approve the Global Settlement. If the Court approves the settlement reached by the Trustee with the insurers, it will then be required to deny the Trustee's motion for approval of the Global Settlement. If the Court denies the Trustee's motion for approval of the Insurance Settlement, it will then be in a position to consider the objections of other parties to the Global Settlement.

The Steadfast policy was issued on May 9, 1996 and named as insured any person "who has been, now is or shall become a duly elected director or a duly elected or appointed officer of the Company." At or about the same time, Reliance issued a similar excess policy. These so-called "D & O" policies provided liability coverage to EquiMed's directors and officers for liabilities and related legal expenses which they personally might incur in connection with their positions. Steadfast and Reliance have denied that Colkitt and others were covered in the policies for liabilities incurred by them in the *Rahman* action and in other suits brought against them. The insurers have sought in the Coverage Action rescission of the policies because of alleged material misrepresentations made in EquiMed's application for the policies. In the pending Coverage Action, the Bankruptcy Court has been asked to determine those issues. Under the terms of the Insurance Settlement, the bankruptcy estate is to receive $1.3 million, and the claims of Colkitt and other officers and directors are to be extinguished.

In seeking to withdraw from the Insurance Settlement, the Trustee has expressed his belief that the proposed Global Settlement will result in the acquisition of far more proceeds for the bankruptcy estate than would occur if the Court denies approval of the Global Settlement because of its approval of the Insurance Settlement, and if the Trustee is then required to go forward with prosecution of the adversary proceeding. Steadfast and Reliance argue that the Insurance Settlement is a valid contract between themselves and the Trustee and should be enforced. In advancing this argument, the insurers overlook the fact that the Insurance Settlement must be approved by this Court as fair and reasonable before it becomes effective.

Whether or not the Trustee now supports the Insurance Settlement, the ultimate responsibility is that of this Court to determine whether the Insurance Settlement is legally supportable and is fair and reasonable insofar as all interested parties are concerned. The insurers argue that the Trustee, in attempting to withdraw from the Insurance Settlement Agreement, violates his fiduciary duties and obligations. However, in *In re Martin,* 91 F.3d 389, 394 (3d Cir.1996), the Third Circuit recognized that if a trustee no longer believes a settlement to be in the best interest of the estate, he or she does not breach any term of a stipulated agreement by doing so, inasmuch as it is for the bankruptcy court to approve or reject a motion for approval of the settlement. In any event, that the Trustee may have supported the Insurance Settlement at an earlier date is not a controlling factor in this Court's consideration of the fairness of the Insurance Settlement. The motion filed by the Trustee for approval of the Insurance Settlement was opposed in the Bankruptcy Court by various other parties, including Colkitt and the government.[14] It is those arguments in support of and in

---

14. Under the *Rahman* settlement, rights to the proceeds of the D & O policies have been assigned to the government.

opposition to the motion for approval of the Insurance Settlement which this Court must now consider.

 In deciding whether to approve or deny the Trustee's motion to approve the Insurance Settlement, this Court at the outset must determine if the agreement reached is itself a valid one. As the Second Circuit noted in *In re Joint Eastern and Southern District Asbestos Litigation*, 982 F.2d 721, 750 (2d Cir.1992), the Court in considering a settlement cannot uphold "an impairment of rights accomplished in violation of applicable legal rules." On the record here, this Court concludes that the Insurance Settlement does indeed impair the rights of Colkitt and other officers and directors of EquiMed and cannot now be approved.

The parties objecting to the Insurance Settlement rely on the Fifth Circuit decision in *In re Louisiana World Exposition, Inc.*, 832 F.2d 1391, 1394 (5th Cir.1987). In that case, the Court held that the proceeds of an officer and director insurance policy belonged to the officers and directors and are not part of a debtor's bankruptcy estate. *Id.* at 1394. The Court determined that "the liability proceeds, which belong only to the directors and officers, are not part of the estate." *Id.* at 1401. To the same effect, are *In re First Central Financial Corp.*, 238 B.R. 9, 16–17 (Bankr.E.D.N.Y.1999) and *In re Imperial Corp. of America*, 144 B.R. 115, 118–19 (Bankr.S.D.Cal.1992). In *First Central*, the Court noted that D & O policies are obtained for the protection of individual directors and officers and indemnification coverage "does not change this fundamental purpose." *First Central*, 238 B.R. at 16.

The insurers rely on *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986) in arguing that the proceeds of the policies at issue belong to the EquiMed estate. However, the insurance policy at issue in *Robins* was a products liability policy which protected the corporation as well as its officers and directors. 788 F.2d at 997, 1001. Such a policy is different from the coverage afforded by the policies at issue here which do not cover the liability exposure of the corporation "but only of its directors and officers and is payable only to them." *Louisiana World*, 832 F.2d at 1399.

From its review of the applicable authorities, this Court concludes that the officers and directors of EquiMed and the government should be entitled to litigate the question whether they are protected by the D & O liability policies at issue here and are entitled to the policies' benefits. The Insurance Settlement which extinguishes the rights which Colkitt and other officers and directors might have in the policies at issue cannot therefore be approved by the Court. Since rights under the policies may belong to the officers and directors and not to EquiMed, the Trustee was not entitled to bargain away those rights in return for a payment to the estate from the insurers. Colkitt and the other officers and directors were not parties to the Insurance Settlement and were not compensated in any way for the extinguishment of their rights which would result from court approval of that Settlement. Under the Global Settlement, Colkitt and the other officers and directors have now been assigned any rights possessed by EquiMed in the policies, and they or their assignee are therefore now entitled to pursue their and EquiMed's rights in the adversary proceeding which is now pending in the Bankruptcy Court. The coverage questions presented in that adversary proceeding are for the Bankruptcy Court to decide.

For these reasons, the Trustee's motion for approval of the Insurance Settlement

pending before this Court in Civil No. H–01–3014 will be denied. The objections to the Global Settlement asserted by Reliance and Steadfast are accordingly overruled.

## VI

### Trustee's Motions to Assume and Assign Leases

The Trustee has filed in the Bankruptcy Court a motion to assume and assign an unexpired ground lease relating to property in Harrisburg, Pennsylvania, and also a motion for authorization to assume and assign an unexpired ground lease relating to property in Indiana County, Pennsylvania. The Global Settlement is binding on certain parties only if these leases are assumed and assigned by way of an Order of Court. On September 19, 2001, this Court entered an Order granting the motion of the Trustee and the President Subsidiaries for withdrawal of reference of these two motions. The matters in question have now been docketed here as Civil No. H–01–2676.

■■■ Treatment Centers and PFG and also the Indiana Hospital Entities have filed oppositions to the Trustee's pending motions to assume and assign and have also opposed the Trustee's motion for approval of the Global Settlement. In opposing the approval of the Global Settlement, these parties contend that this Settlement is not fair and equitable and in the best interests of the estate. However, Treatment Centers, PFG and the Indiana Hospital Entities are not creditors of EquiMed or of any of the President Subsidiaries, nor are they able to assert an equitable claim against the estate. They therefore have no standing to object to terms of the Global Settlement. *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 849 (Bankr.S.D.N.Y. 1989). Their arguments that there has

been no competitive bidding on the proposed assignments of the leases, that the Trustee has not maximized the value of EquiMed's leasehold estates and that the Global Settlement should therefore not be approved will not be addressed by the Court. However, as the landlords under the leases in question, these parties may, of course, present arguments in opposition to the Trustee's pending motions to assume and assign.

The assumption and assignment of unexpired leases in a bankruptcy case is governed by Section 365 of the Bankruptcy Code. The Code provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). In addition:

[t]he trustee may assign an executory contract or unexpired lease of the debtor only if(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

■■■ The standard to be applied by a court in determining whether or not to approve the disposition of property is whether the trustee exercised sound business judgment. "The history surrounding the enactment in 1978 of current Chapter 11 and the logic underlying it buttress our conclusion that there must be some articulated business justification... for using, selling or leasing property out of the ordinary course of business." *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir.1983). Although that case involved 11 U.S.C. § 363, its principles are equally applicable to the assumption and assignment of unexpired leases under § 365. What this Court must determine is whether the

Trustee's assumption and assignment of these leases satisfies the requirements of § 365 and whether a "sound business reason" exists for such action. *In re Lionel Corp.*, 722 F.2d at 1071.

(a)

*The Harrisburg Lease*

On January 30, 1987, Onco–Tech, a joint venture of Oncology Services, Inc. and Mobile Diagnostech, Inc., entered into a sublease agreement whereby it subleased the property located at 775 South Arlington Avenue, Harrisburg, Pennsylvania ("the Harrisburg Property") from Medical Realty One Associates ("Medical Realty"). Medical Realty was leasing the property from Community General Osteopathic Hospital, Inc., subject to a lease agreement dated March 29, 1986 (the "prime lease"). Subsequent subleases are subject to the terms of the prime lease.

On June 26, 1998, with the permission of Medical Realty, Onco–Tech entered into an agreement with EquiMed, assigning its interest as tenant under the sublease to EquiMed. The parties also amended the sublease agreement by extending the term of the lease for a 20 year period. Later, Medical Realty assigned its rights as the landlord to Treatment Centers. In January of 1999, EquiMed attempted to transfer all of its right, title and interest in the ground lease to Keystone, which is presently operating a cancer treatment center on the premises. The Trustee alleges that EquiMed has not been in default under the ground lease and that all rental payments have been made by Keystone.

On August 31, 2000, Keystone initiated an adversary proceeding in the Bankrupt-cy Court, alleging that all of EquiMed's interest in the premises subject to the ground lease had been transferred to Keystone prior to the filing of EquiMed's involuntary bankruptcy petition. Adversary No. 00–1469.[15] In that action, Keystone sought a declaratory judgment determining which party had a sublease interest in the Harrisburg Property. Named as defendants in that Adversary Proceeding are the Trustee, Treatment Centers and PFG.[16] Treatment Centers and PFG are jointly the Landlord.

On March 29, 2001, Keystone moved to dismiss the complaint which it had filed in the adversary proceeding. However, before the Bankruptcy Court could rule on the motion to dismiss, the Landlord filed a counterclaim, seeking a declaration of the Court that the assignment from EquiMed to Keystone was invalid. The Bankruptcy Court granted Keystone's motion to dismiss, but declined to dismiss the counterclaim, which remains pending in the adversary proceeding. As part of the Global Settlement, EquiMed will, upon approval of the settlement, assign any interest it has in the ground lease to Keystone.

In opposing the Trustee's motion to assume and assign the ground lease relating to the Harrisburg Property, Treatment Centers and PFG advance a laundry list of arguments. They contend that the lease in question must be deemed rejected by operation of § 365(d)(4), that Keystone is a trespasser, that the Global Settlement Agreement attempts to assign EquiMed's interest in the Harrisburg Property to Keystone without consideration, that the Trustee cannot assign the Harrisburg lease to Keystone without the Landlord's

---

**15.** In its Memorandum and Order of February 12, 2001, this Court denied the Trustee's motion to withdraw reference of that adversary proceeding in its entirety. Civil No. H–00–3487.

**16.** PFG is a general partner of Treatment Centers.

consent, that adequate assurance of future performance by Keystone as the assignee has not been provided pursuant to § 365(f)(2), that the Provident security agreement violates the terms of the lease, that the form of the security agreement in favor of Provident Bank is defective and that the assumption and assignment agreement is deficient. There is no merit to any of these contentions.

Relying on § 365(d)(4) of the Bankruptcy Code, Treatment Centers and PFG contend that the Harrisburg lease must be deemed rejected and that the Trustee's motion to assume and assign denied. Under that statutory provision, if a trustee does not assume an unexpired lease under which the debtor is the lessee within 60 days after the date of the order for relief or within such additional time as the Court for cause fixes within such 60 days, then the lease must be deemed rejected. *Id.*

From time to time, the Trustee has requested and been granted extensions of this 60 day period. In view of the complexity of the *EquiMed* bankruptcy proceedings, resulting in large part from the interrelation between the Trustee's claims asserted in the adversary proceeding and the government's claims asserted in the *Rahman* case against the same persons and entities, good cause existed for all of the extensions granted by the Bankruptcy Court. The third extension expired on September 7, 2001, and prior to that date the Trustee sought a fourth extension through January 31, 2002. However, Judge Mannes did not enter an order approving this requested extension until some time after September 7, 2001. Relying on *Debartolo Prop. Mgmt., Inc. v. Devan,* 194 B.R. 46, 51 (D.Md.1996), Treatment Centers and PFG argue that this Court no longer has statutory authority over the Harrisburg lease because the mere filing of a motion for an extension of time is not sufficient for obtaining such an extension.

■ The facts here are quite different from those present in *Debartolo.* In their "Limited Opposition," to the Trustee's motion to further extend the statutory period beyond September 7, 2001, Treatment Centers and PFG consented to an extension through October 4, 2001. Since the Bankruptcy Court has granted that extension and since the Trustee's motion to assume and assign was filed before October 4, 2001, there has been compliance with § 365(d)(4). Treatment Centers and PFG having asked the Bankruptcy Court in their Limited Opposition to enter an Order "granting and limiting an extension under § 365(d)(4) of the Bankruptcy Code through October 4, 2001," are now estopped from contending that the extension which was granted was not a valid one.

■ In any event, this Court would agree with the Ninth Circuit's decision in *In re Southwest Aircraft Services, Inc.,* 831 F.2d 848 (9th Cir.1987), *cert. denied,* 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988). In that case, the Court interpreted § 365(d)(4) as providing that, if cause for an extension arises within the sixty day period and if a motion for an extension has been made within that period, a Bankruptcy Court may grant the requested extension even after the sixty day period has expired. *Id.* at 853. As Judge Smalkin recognized in *Debartolo,* a majority of other courts since the Ninth Circuit decided *Southwest Aircraft* have interpreted § 365(d)(4) to permit extensions when, as here, a motion for extension has been filed within the sixty day period of time. 194 B.R. at 52. Particularly in these complex bankruptcy proceedings, the Trustee should not be prejudiced because the Bankruptcy Judge did not act timely on his motion for an extension.

There is no merit to the argument that the assignment of EquiMed's interest in the Harrisburg lease to Keystone is not supported by consideration. Keystone has agreed to execute new promissory notes, to provide additional collateral and to forego certain substantial rights. The assignment of the Harrisburg lease to Keystone is an important part of the Global Settlement, and Keystone's participation in the settlement is expressly conditioned upon receiving an assignment of the Harrisburg lease.

■ Nor is the proposed assignment barred because the Harrisburg lease prohibits assignments without the Landlord's consent. It is well established that under § 365(f)(1) a lease may be assigned by a trustee notwithstanding a provision restricting or preventing its assignment. § 365(f)(1). As the Court held in *In re Jamesway Corporation*, 201 B.R. 73, 77–78 (Bankr.S.D.N.Y.1996), not only are direct anti-assignment provisions invalidated by the Bankruptcy Code but also indirect ones which may hamper a trustee's ability to assign. Contrary to the Landlord's contention, the EquiMed bankruptcy estate is realizing substantial value as a result of the Trustee's assignment of this lease to Keystone since it is a part of the Global Settlement.

Treatment Centers and PFG argue that the lease is violated by the provision in the Global Settlement which pledges EquiMed's ownership interest to Provident Bank. But a pledge of an ownership interest is not a transfer of the ownership of the tenant, and the mere act of the pledge is not a violation of lease terms. A tenant is free to grant a security interest in fixtures but only to the extent of the interest which the tenant possesses. If the Landlord here has a prior right in fixtures as against the interest of Keystone as the tenant, Treatment Centers and PFG can assert that prior right against Provident at a later time.

■ The record here indicates that adequate assurance of future performance has been provided by Keystone which has been in possession of the premises for over two and one-half years. During that period, substantial and timely payments of rent and taxes have been made. George Keister, who is a part owner of Keystone, testified at the hearing held before the Court on September 26, 2001. His testimony and the financial statements entered into evidence establish that there is a reasonable expectation that rent for the Harrisburg property will continue to be paid and that other obligations will be met. *See In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr.S.D.N.Y.1985). Whether or not the terms of the assignment specifically state that Keystone will comply with all of the obligations under the lease, adequate assurance of future performance has been shown by Keystone on the record here.

Treatment Centers and PFG argue that before the commencement of EquiMed's bankruptcy proceedings, EquiMed breached the Harrisburg lease by allowing Keystone to remain in possession. But Keister has testified that the Landlord's authorized representative consented in writing to EquiMed's subleasing of the property to Keystone. In any event, it is not necessary for this Court to decide that issue. Even if the Landlord were able to prove that there was a prior breach of the lease, it was a minor, technical default which has now been cured. *Id.* During the time that Keystone was in possession of the property, the Landlord sustained no loss or injury. Rent in the amount of approximately $400,000 was over the years paid to and accepted by

the Landlord,[17] and all other obligations of the lease were satisfied during the period in question. Since the lease was not in default, the Trustee had the right under § 365 to assume and assign it.

For all these reasons, this Court concludes that the Trustee has met his burden under § 365(a) of showing that grounds exist for assuming and assigning the Harrisburg lease to Keystone. There is a sound business reason for the Trustee in the exercise of reasonable business judgment to assign the lease to Keystone and to include such assignment as a part of the Global Settlement. Accordingly, the Trustee's motion for authorization to assume and assign that lease will be granted, and the objections of Treatment Centers and PFG to the Global Settlement will be overruled.

### (b)

### *The Indiana County Lease*

On June 24, 1986, Oncology Services, Inc. and Mobile Diagnostech, Inc. entered into an agreement with Indiana Healthcare, whereby they leased a 1.5 acre parcel of land located in White Township, Indiana County, Pennsylvania ("the Indiana County Property"). The assets of Oncology Services, Inc. and Mobile Diagnostech, Inc. were thereafter transferred to and assumed by Onco–Tech. On March 29, 1994, Onco–Tech entered into an agreement assigning its rights in this particular parcel of property to Indiana Regional Cancer Center, Inc. EquiMed is the successor-in-interest and has constructed the building which now houses the cancer treatment center located there.

On December 31, 1998, EquiMed entered into an agreement whereby it leased the Indiana County Property to Oaktree.

The lease expires on December 31, 2003 but provides for three automatic renewals of five years each. Oaktree is presently operating the cancer treatment center on the premises and has been making rental payments due under the original ground lease directly to the landlord. The rights of the parties to the original 1986 lease, to the cancer center itself and to the lease by EquiMed to Oaktree are the subject of an adversary proceeding brought in the Bankruptcy Court by the Trustee and Oaktree against the Indiana Hospital Entities and others. In that action, the Trustee and Oaktree are seeking to enjoin the landlord from violating a non-compete provision of the lease. The Trustee contends that Oaktree is not in default on the lease, and that rental payments have been paid to date. As a part of the Global Settlement, EquiMed will, if the Global Settlement is approved, assign its interest in the lease to Oaktree. In addition, Oaktree will purchase the cancer center building for $17,500 and has agreed to pay the Trustee $20,000 should it prevail in the adversary proceeding.

 In opposing the Trustee's motion to assume and assign the ground lease relating to the Indiana County Property, the Indiana Hospital Entities argue that this Court's approval of the Global Settlement could result in inconsistent judicial rulings since there is pending in the Bankruptcy Court the adversary proceeding brought by the Trustee and Oaktree. The Indiana Hospital Entities contend that approval of the proposed Global Settlement is premature and should be deferred until after the resolution of the adversary proceeding. This Court must disagree.

---

**17.** Payments were in fact made by EquiMed after it had received the amounts due from Keystone. After having accepted rent checks for several months in 1999, the Landlord returned them because it was upset about EquiMed's action in closing a separate facility.

Pursuant to § 365 of the Bankruptcy Code, the Trustee is authorized to assume and assign any unexpired lease. The granting by this Court of the Trustee's pending motion to assume and assign does not resolve the issues in the adversary proceeding. Indeed, the Global Settlement recognizes that Oaktree will continue to litigate that matter, and Oaktree has agreed to pay the Trustee $20,000 if it is successful in the adversary proceeding.

The Indiana Hospital Entities also argue that Oaktree has been improperly entitled under the Global Settlement Agreement to assign the lease to another party without regard to the Landlord's right to ascertain the credit worthiness of the new entity. However, if any future assignment of the lease by Oaktree does not comply with provisions of the lease, the Indiana Hospital Entities would have the right to object and to take appropriate legal action.

The Indiana Hospital Entities further argue that there has been no competitive bidding on the proposed assignment of the ground lease or on the proposed sale of the cancer center, and that the $17,500 to be received by the Trustee is inadequate. As noted, the Indiana Hospital Entities are not creditors and have no standing to object to the Global Settlement on the ground that the assignment to Oaktree was made for a nominal fee and in the absence of competitive bidding. In any event, there was adequate consideration. Not only is Oaktree paying $17,500 for the building but it is also assuming the indebtedness on the building in the amount of approximately $400,000.

 Finally, this Court concludes on the record here that there has been adequate assurance of future performance of the lease by Oaktree. Donald M. Gallo is the President of Oaktree and testified at the hearing held on September 26, 2001. As he testified, Oaktree has for the last

eight to ten months been paying the monthly rental of $851 plus taxes. The Indiana Hospital Entities argue that it would be premature and improper for this Court to determine that the lease was not in default prepetition, to determine that there has been adequate assurance of future performance and to conclude that the lease may therefore be assumed and assigned pursuant to 11 U.S.C. § 365(a). According to these parties, facts of record before this Court do not support any such determinations. The Court must disagree. There has never been a prior claim by the landlord that the lease was in default, and no action was previously taken by the landlord to terminate the lease. According to the testimony of the witness Gallo, there was no pre-petition default, and the lease was not previously terminated.

On the record here, this Court concludes that the Indiana Hospital Entities have not met their burden of proving that there was a prior default by Oaktree and that the lease was previously terminated. Moreover, financial statements of Oaktree indicate that it has ample cash available for the payment of rent, that it has a line of credit with a financial institution in the amount of some $850,000, and that therefore it has the ability to meet future obligations imposed by the lease. This evidence is sufficient to satisfy the Trustee's burden of showing that there is adequate assurance of future performance of the lease by Oaktree.

For these reasons, this Court concludes that the Trustee has met his burden under § 365(a). A sound business reason exists for the assignment of the Indiana County lease to Oaktree and for including such assignment as a part of the Global Settlement. Accordingly, the Trustee's motion for authorization to assume and assign the Indiana County lease will be granted, and the objections of the Indiana Hospital En-

tities to the Global Settlement will be overruled.

## VII

### *Conclusion*

For all the reasons stated, the Trustee's motion for approval of the Global Settlement will be granted, and the Trustee's motion for approval of the Insurance Settlement will be denied. The Trustee's motion to assume and assign an unexpired ground lease relating to property in Harrisburg, Pennsylvania will be granted, and the Trustee's motion for authorization to assume and assign an unexpired ground lease relating to property in Indiana County, Pennsylvania will also be granted. An appropriate Order will be entered by the Court.